# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 31 2018, 8:54 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of:<br><br>D.W. (Minor Child)<br><br>and<br><br>T.W. (Mother)<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | January 31, 2018<br><br>Court of Appeals Case No.<br>45A04-1705-JT-1238<br><br>Appeal from the Lake Superior Court<br><br>The Honorable John M. Sedia, Special Judge<br><br>Trial Court Cause No.<br>45D06-1304-JT-113 |

**Pyle, Judge.**

## Statement of the Case

T.W. ("Mother") appeals the termination of the parent-child relationship with her daughter ("D.W."), claiming that there is insufficient evidence to support the termination because the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that the conditions that resulted in D.W.'s removal will not be remedied. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm the trial court's judgment.[1]

We affirm.

## Issue

> Whether there is sufficient evidence to support the termination of the parent-child relationship.

## Facts

Mother has three children, daughter, J.G. ("J.G."), who was born in 1994; son, M.G. ("M.G."), who was born in November 1996; and D.W., who was born in August 2008. In December 2011, Mother and Father were charged with twelve felony counts arising from allegations that they had confined M.G. in a dog

---

[1] V.W. ("Father") is the father of D.W. His parental rights were also terminated; however, he is not a party to this appeal.

cage, abused him with a horse whip, threatened him with a knife and gun, and deprived him of food and water.[2] All three children were removed from the home. M.G. was placed with his biological father, and D.W. and J.G. were placed in foster care.[3] At the time of the removal, three-year-old D.W. was developmentally delayed and her speech was so poor that therapists were barely able to communicate with her. D.W. was subsequently adjudicated to be a child in need of services.

[4] After Mother was released from jail on bond, she initially complied with a court order to complete parenting classes, attend individual therapy sessions, and participate in supervised visitation with D.W. and J.G. in the family's home. However, Mother was subsequently discharged from individual therapy sessions after her therapist concluded that the sessions were not productive because Mother was unwilling to accept responsibility for her son's abuse.

[5] When Father was released from jail on bond in March 2012, the trial court issued a no-contact order with respect to D.W. because Father had refused to comply with court-ordered services. Because Father frequently stayed at the family's house, Mother's supervised visits with D.W. and J.G. were moved outside the home. In April 2012, Mother refused all further contact with DCS;

---

[2] Mother subsequently pled guilty to two counts of Class D felony neglect of a dependent and was sentenced to eighteen months on house arrest and eighteen months of probation.

[3] Although D.W. and J.G. were initially placed together in foster care, the two girls were eventually separated. D.W. was placed with her current foster family in October 2013.

however, she continued the supervised visits with D.W. and J.G. In November 2012, the trial court suspended the visits with both girls after Mother "blocked [J.G.] from leaving a bathroom and confronted her about some new allegations that she had made regarding [Father] and coming forward regarding old allegations." (Tr. Vol. 3 at 165).

[6] As a result of this confrontation and Mother's failure to communicate with DCS, D.W.'s permanency plan was changed from reunification to termination of parental rights with adoption. In April 2013, DCS filed a petition to terminate both Mother's and Father's parental rights. Nine months later, in January 2014, Mother filed motions to modify the permanency plan and for a bonding assessment. The trial court granted the motion for a bonding assessment, which was completed in October 2014. At the time of the bonding assessment, six-year-old D.W. had not seen Mother in two years and did not recognize her. Following the assessment, the trial court ordered visitation between D.W. and Mother to determine whether D.W.'s plan should be modified from termination of parental rights and adoption to reunification.

[7] Therapist Francette Williams ("Williams") supervised the visits and noticed that D.W. was typically anxious, disengaged, and withdrawn. D.W. often bit her lip, and tears dropped from her eyes. Mother, however, did not appear concerned about her daughter's tears or mood. While D.W. was crying during one visit, Mother said D.W. must have a cold. During another visit, Mother ignored D.W.'s tears and told D.W. that she had brought new things to color.

After supervising eight visits between D.W. and Mother, Williams recommended that the visits cease because D.W. had no attachment to Mother.

[8] In May 2015, therapist Faith Hayes ("Hayes") completed another bonding assessment. In her bonding assessment report, Hayes noted that during the assessment, D.W. "expressed severe anxiety to near panic, sought comfort from the clinician (who [was] a stranger) and reported that she [was] afraid and [did] not want to go to visits with the biological parent or return to their home." (DCS Ex. 8 at 6). Hayes further noted that the "level of fear exhibited by [D.W.] towards [Mother] indicated that the probability of a healthy, secure attachment [was] very unlikely . . . due to the biological parent's inability to acknowledge and reflect the child's emotional state, particularly when the child [was] distressed." (DCS Ex. 8 at 6). Hayes recommended that the "supervised visitation between the child and biological parent be immediately suspended due to the child's level of distress." (DCS Ex. 8 at 7).

[9] One month later, in June 2015, the trial court denied Mother's motion for modification of the permanency plan and ordered the cessation of all parenting time between Mother and D.W. The court further directed the parties' attorneys to coordinate a hearing on the termination petition. This three-day hearing was held in March 2017.

[10] At the termination hearing, DCS Case Manager Lisa Olsen ("Case Manager Olsen") testified that Mother had done everything DCS had asked from December 2011 until Father was released from jail in March 2012. Thereafter,

from 2012 until the termination hearing in 2017, Mother had "remained in a relationship with [Father], who was the primary abuser, which [had] inhibited the entire reunification process." (Tr. Vol. 3 at 217). At the time of the hearing, D.W. had been living with her current foster family for three and one-half years and no longer received services because there was no further need for them. Case Manager Olsen also testified that termination was in D.W.'s best interests. D.W.'s therapist testified that D.W. was very bonded to her foster parents and that it could be devastating to her mental and physical stability to move her out of their home. The therapist also testified that she "would not be comfortable reuniting a child with a parent who had not attempted services." (Tr. Vol. 4 at 139). Also at the hearing, Mother testified that she had been living with Father for the previous five years.

[11]  Following the hearing, the trial court issued an order concluding that it "would not be in [D.W.]'s best interests to be taken away from a consistent, stable, family environment to be placed back into a home where the dysfunction and abuse that caused her removal have not been addressed." (App. Vol. 2 at 16). The trial court also concluded that "[Mother] and [Father had] clearly demonstrated a pattern of unwillingness to deal with parenting problems and to cooperate with those providing services. There has been no evidence presented that the conditions have changed." (App. Vol. 2 at 17). The trial court terminated the parental rights of both Mother and Father, and Mother appeals.

# Decision

[12]     The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[13]     When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id*. Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[14]     A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

[15] Here, Mother argues that there is insufficient evidence to support the termination of her parental rights. Specifically, she contends that the evidence is insufficient to show that (1) there is a reasonable probability that the conditions that resulted in D.W.'s removal or the reasons for placement outside the parent's home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to D.W.'s well-being.

[16] However, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there

is a reasonable probability that the conditions that resulted in D.W.'s removal or the reasons for her placement outside Mother's home will not be remedied.

[17] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *E.M.*, 4 N.E.3d at 643.

Here, our review of the evidence reveals that D.W. was removed from her home following allegations that Mother and Father had abused and tortured M.G. Mother participated in DCS services for three months until Father was released from jail on bond. Thereafter, Mother refused all further contact with DCS. She continued to attend supervised visits with her daughters for several

more months until the visits were suspended after she confronted her oldest daughter about making allegations about Father. Mother had no further contact with D.W. for two years until DCS had filed a termination petition and the trial court had granted Mother's motion for a bonding assessment. Following the assessment, Mother was granted visitation with D.W. to determine whether D.W.'s plan should be modified from termination of parental rights and adoption to reunification. During the visits, Mother was not concerned about D.W.'s mood or well-being. The visits were subsequently suspended because D.W. showed no attachment to Mother. A second bonding assessment revealed that the probability of such an attachment forming was unlikely.

[18] At the March 2017 termination hearing, the evidence revealed that Mother had been living with Father for the past five years. Neither Mother nor Father had participated in services during this time. Although Mother had participated in services for a short time following the removal of her daughter, Father had never done so. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted D.W.'s removal would not be remedied. We find no error.

[19] Affirmed.

Riley, J., and Robb, J., concur.